IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FRANCISCO ESPARZA, | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No. 3:19-CV-2284-L-BH |
| | § | |
| ANDREW SAUL, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| **Defendant.** | § | Referred to U.S. Magistrate Judge[1] |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Francisco Esparza (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act. (*See* docs. 1, 12.)  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I.  BACKGROUND

On March 29, 2016, Plaintiff filed his application for DIB, alleging disability beginning on September 16, 2013. (doc. 8-1 at 178.)[2]  His claim was denied initially on September 7, 2016 (*Id.* at 110), and upon reconsideration on February 27, 2017 (*id.* at 115).  On April 28, 2017, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 119.)  He appeared and testified at a hearing on January 24, 2018. (*Id.* at 39-84.)  On September 5, 2018, the ALJ issued a decision finding him not disabled. (*Id.* at 13.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on November 5, 2018.

---

[1]By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

(*Id.* at 176.)  The Appeals Council denied his request for review on July 22, 2019, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 6.)  He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**A.**    **Age, Education, and Work Experience**

Plaintiff was born on June 20, 1981, and was 36 years old at the time of the hearing. (doc. 8-1 at 53, 178.)  He had completed the tenth grade and could communicate in English. (*Id.* at 54.)  He had past relevant work as a quality control inspector, an inventory supervisor or inventory manager, and an order puller. (*Id.* at 79.)

**B.**    **Medical, Psychological, and Psychiatric Evidence**

On September 16, 2013, Plaintiff presented to the Emergency Department (ED) at Methodist Dallas Medical Center (Methodist) with back and right leg pain. (*Id.* at 626.)  On examination, he showed decreased range of motion, point tenderness with positive straight leg raises (SLR) on the right, and no motor deficit. (*Id.*)  He had no pain improvement with flexeril and gabapentin ten hours after onset of pain. (*Id.* at 626-27.)  A lumbar spine CT scan dated September 17, 2013, showed multilevel disc disease with disc protrusions or extrusions, with calcifications at L3-4 and L4-5 and less prominent disease at L5-S1. (*Id.* at 630.)

On September 18, 2013, Plaintiff returned to Methodist with continuing right hip/leg pain and back pain. (*Id.* at 633.)  He reported tingling pain with onset two days prior, when at work, he missed a step and twisted. (*Id.*)  Examination showed significant right paraspinal spasm, positive SLR on right, 5/5 motor strength, 2/4 reflexes, and normal sensation. (*Id.*) He was diagnosed with sciatica and referred for an MRI. (*Id.* at 635.)

On September 25, 2013, Plaintiff established care with Kenneth Bayles, D.O. (*Id.* at 370-71.)

He had missed a step while walking at work and felt acute onset of pain in his right hip and leg. (*Id.* at 370.) At the end of his work shift, his pain increased and he had difficulty standing from a chair. (*Id.*) Pain medications helped some, but his symptoms still persisted. (*Id.*) Physical examination showed diminished Achilles reflex on the right; hallucis longus was weaker on the right than the left. (*Id.* at 371.) Lasègue's SLR was positive bilaterally, seated supine SLR test was positive on the right at 45 degrees, Patrick's FABER test was positive on the right, Ely's heel to buttocks test was positive bilaterally, and hip hyperextension test was positive bilaterally. (*Id.*) He had decreased pinprick sensation in the right hallux and right lateral lower extremity from the knee to the ankle. (*Id.*) Quadriceps strength was equal bilaterally, but diminished with repetitive testing on the right. (*Id.*) Plaintiff ambulated without assistance with slight antalgic gait favoring his right lower extremity; he was able to independently heel and toe walk, stand on either leg, and perform a partial squat. (*Id.*) Dr. Bayles noted diminished range of motion of the lumbar spine in all planes; lumbar flexion was 30 degrees, extension was 10 degrees, right lateral flexion was 5 degrees, left lateral flexion was 20 degrees, right rotation was 50 degrees, and left rotation was 50 degrees. (*Id.*) Dr. Bayles diagnosed acute right lumbar radiculitis, prescribed a Medrol Dose Pack for inflammation reduction, and recommended light duty work for four to eight hours. (*Id.*)

Dr. Bayles also completed a work status report regarding Plaintiff's ability to return to his current job duties. (*Id.* at 372.) He opined that he was unable to fully return to work due to his lumbar spine injury and had the following restrictions: stand, sit, twist, and climb stairs and ladders limited to two hours a day; push/pull limited to four hours a day; never kneel/squat or bend/stoop; and lift/carry limited to ten pounds, with sit/stretch breaks of ten minutes every four hours. (*Id.*)

On October 4, 2013, a lumbar spine MRI showed no lumbar fracture, but there was a broad

1 mm disc bulge at L2-3, 2 mm retrolisthesis and a broad disc protrusion at L3-4, a broad 3 mm disc protrusion/herniation with a 4 mm right paracentral component at L4-5, and a broad 3 mm disc protrusion with bilateral neural foraminal narrowing at L5-S1. (*Id.*)  There was also moderate thecal sac stenosis and mild bilateral neural foraminal narrowing at L3-4 and L4-5. (*Id.* at 355-56.)

From October 9, 2013 to March 30, 2016, Plaintiff returned to Dr. Bayles for lumbar spine treatment, and Dr. Bayles also completed work status reports for him. (*Id.* at 373-450.)  Throughout his appointments, he reported continued low back pain as well as pain in the right leg and hip. (*Id.*) Physical exams consistently showed tenderness and diminished range of motion of the lumbar spine, as well as numbness, weakness, and decreased sensation of the right lower extremity, including positive SLR testing and FABER Patrick's testing on the right. (*Id.*)  Dr. Bayles's work status reports generally concluded that Plaintiff's lumbar spine injury prevented him from fully performing his current job duties, and that he could only return to work with certain posture, motion, and lift/carry restrictions, including lifting/carrying between five and twenty pounds for two hours a day; standing, walking, and/or sitting for two hours a day; and never kneeling/squatting, bending/stooping, pushing/pulling, twisting, or climbing stairs and ladders. (*Id.* at 375, 378, 381, 387, 399, 403, 406, 409, 412, 413, 416, 417, 430, 435, 438, 441, 450.)  He found that these limitations had become permanent in the work status report dated January 20, 2016. (*Id.* at 441.)

On November 19, 2013, Plaintiff presented to Nayan Patel, M.D., at the Texas Back Institute (TBI), with low back and right leg pain. (*Id.* at 1128.)  He was still working, but his employer was not abiding by Dr. Bayles's restrictions. (*Id.*)  His pain was a 3 out of 10 and did not improve after physical therapy. (*Id.* at 1128-29.)  His recent MRI demonstrated a right paracentral disc herniation and extrusion at L4-5 and a left disc herniation/extrusion at L3-4. (*Id.* at 1128.)  On examination,

Plaintiff was sitting uncomfortably, had difficulty acquiring full upright position, and was stooped forward and leaning to the left. (*Id.*)  Slow and antalgic gait, paravertebral muscles tender on the right, lumbar loss of motion, SLR positive on right at 45 degrees, and pain with seated SLR on right at back, buttocks, thigh, and lower leg were noted. (*Id.* at 1131.)  Right light touch was abnormal at L5 dermatomes, but there was no gross deformity in the lower extremities bilaterally. (*Id.*)  Dr. Patel assessed right-sided L5 radicular syndrome with an extruded L4-5 disc on the right side causing stenosis, as well as a central disc extrusion at L3-4. (*Id.* at 1132.)  He prescribed new pain medications and administered caudal epidural steroid injections (ESI) on January 21, 2014. (*Id.* at 1132, 1146-48.)

On January 29, 2014, Plaintiff returned to Dr. Bayles and reported no significant relief from the ESI, other than temporary reduced numbness of the right hallux. (*Id.* at 1149-50.)  His current medications included tramadol, Robaxin, and Naprosyn, and he was not working because his employer was unable to accommodate his work restrictions. (*Id.* at 1149.)  Plaintiff moved slowly during examination, but could ambulate without assistance, and heel to toe walking was done without significant pain. (*Id.* at 1150.)  Dr. Bayles recommended selective nerve root block prior to surgical intervention based on the multiple disc levels identified on the MRI. (*Id.*)

On February 26, 2014, Plaintiff presented to Scott Blumenthal, M.D., at TBI, for spinal surgery consultation. (*Id.* at 1121-22.)  Dr. Blumenthal noted that his back pain was mainly right buttock, and that there "was really no central back pain at this point." (*Id.*)  He also noted that Plaintiff had failed conservative treatment, including physical therapy and epidural steroids. (*Id.*)  Dr. Blumenthal assessed herniated disc at L4-5 and L3-4 with right-sided lumbar radiculopathy, and he performed a bilateral decompression at L3-4, as well as a discectomy, right-sided at L3-4 and L4-

5

5 on May 27, 2014. (*Id.* at 357-58, 1122.)

On June 11, 2014, Plaintiff returned to Dr. Blumenthal for surgical follow-up and reported feeling better. (*Id.* at 771.)  His weakness and numbness were improving, and his pain level improved to 2/10. (*Id.*)  At a follow-up visit on July 30, 2014, Dr. Blumenthal noted that Plaintiff continued to improve and was willing to return to work, but a recent Functional Capacity Evaluation (FCE) indicated that he was only ready for light duty, while his current job requirements were heavy. (*Id.* at 1109.)  Dr. Blumenthal deferred to Plaintiff's treating doctor's recommendation for work hardening. (*Id.* at 1109-10.)

On May 8, 2015, Plaintiff underwent another FCE. (*Id.* at 1023-28.)  He had limitations in walking, overhead reaching, reaching, stooping, kneeling, and balancing, and he was limited to lifting 35 pounds occasionally and 20 pounds frequently. (*Id.* at 1027-28.)  He could not perform his regular job duties because the required physical demand level was very heavy and his current physical performance level was sedentary. (*Id.* at 1028.)

On June 2, 2015, Plaintiff presented to George Cole, D.O., for a Designated Doctor Examination to determine Maximum Medical Improvement (MMI). (*Id.* at 1094-98.)   On examination, he exhibited mild distress and walked with a slight limp to the right. (*Id.* at 1095.) Reflexes test was within normal ranges, except for the right Achilles, but gait test and tandem gait test were both abnormal. (*Id.* at 1095-96.)  Plaintiff had an absent Achilles reflex on the right, with right SLR positive for radicular signs with foot pain, hamstring tightness, and low back pain on the right side in both the sitting and supine positions. (*Id.* at 1096.)   SLR on the left produced contralateral pain on the right thigh. (*Id.*) There was pain to palpation of the sciatic distribution on the right and mild pain to palpation of the lower lumbar spine, but there was no pain to palpation of

the sacroiliac joint, Ely's test was negative for radicular signs, and he could toe and heel walk without difficulty. (*Id.*)  Dr. Cole concluded that Plaintiff had not reached MMI. (*Id.* at 1097.)

On March 17, 2016, Plaintiff presented to the ED at Parkland Hospital (Parkland) with chest pain. (*Id.* at 1330.)  He reported "running pain" of the left side of the chest, as well as associated left arm tingling and nausea. (*Id.* at 1330.)  He was not distressed and denied headaches or any neck or back pain. (*Id.* at 1330-31.)  Physical examination showed normal range of motion, no tenderness or edema, full 5/5 strength in all extremities, and normal mood and affect. (*Id.* at 1331.)

On April 15, 2016, Plaintiff presented to Howard Nguyen, D.O., for a medication refill. (*Id.* at 452.)  Dr. Nguyen appeared to assess migraine headaches and depression. (*Id.*)[3]

On March 30, 2016, Dr. Bayles provided a medical source statement for Plaintiff's workers' compensation claim. (*Id.* at 447-49.)  He noted that since September 2013, Plaintiff had received continued conservative treatment, including physical therapy, medications, and steroid injections, and had undergone surgical intervention in May 2014, but that he continued to have low back pain and right leg and hip pain, as well as numbness and tingling into the right lower extremity at all times. (*Id.* at 447.)  He reported more frequent flare-ups, and that his activity tolerance had diminished over time due to increasing pain. (*Id.*)  Physical examination showed decreased lumbar range of motion in multiple planes, as well as tenderness in the lumbar and lumbosacral spine, right sacroiliac area, and the right trochanteric region. (*Id.* at 447-48.)  Quadriceps strength was weaker on the right than on the left, and there was decreased pinprick sensation in the right lower extremity compared to the left. (*Id.*)  He also had loss of relevant reflex on the right side, decreased sensation and motor weakness, absent Achilles reflex, and prolonged weakness of the toe extensors on the

---

[3]Dr. Nguyen's handwritten treatment notes are difficult to decipher.

right side. (*Id.*) He also reported difficulty sleeping and concentrating and having "increased emotional days" due to the inability of being active. (*Id.* at 448.) Dr. Bayles opined that under the Fourth Edition, AMA Guidelines, Plaintiff had a 10% whole person physical impairment, and he had reached statutory medical improvement on August 15, 2015. (*Id.* at 449.)

A lumbar spine MRI dated June 11, 2016, showed disc desiccation and decreased disc height at L3-4 and L4-5, including bilateral laminotomy at L3-4 and questionable right laminotomy at L4-5 with enhancing post-surgical granulation tissue, as well as degenerative changes of lower lumbar spine with mild spinal canal stenosis at L3-4 and L4-5. (*Id.* at 1291-92.)

On September 6, 2016, State Agency Medical Consultant (SAMC), Laurence Ligon, M.D., completed a physical residual functional capacity (RFC) assessment based on the medical evidence. (*Id.* at 85-92.) He noted his medically determinable physical impairments as severe spine disorders and severe dysfunction of major joints. (*Id.* at 88.) Dr. Ligon opined that Plaintiff had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit for about 6 hours in an 8-hour workday; and push and pull unlimited weight (other than shown for lift and carry), with no postural, manipulative, visual, communicative, or environmental limitations. (*Id.* at 89-90.) Based on his physical RFC, Plaintiff had the maximum sustained work capability for light work. (*Id.* at 91.) Dr. Ligon opined that Plaintiff's alleged symptoms were partially supported by the evidence of record. (*Id.* at 89.)

On September 26, 2016, Plaintiff established mental health treatment with Dallas Metrocare Services (Metrocare), and presented to an Advanced Practice Nurse (APN) for psychiatric evaluation. (*Id.* at 587-90.) He reported a history of depression beginning in 2011, and had been taking Citalopram for a year. (*Id.* at 587.) He felt sad, helpless, and worthless, and rated his

depression a 7 out of 10; he also had difficulty concentrating and had mood swings. (*Id.*) His excessive worry caused him anxiety attacks, and his depression and anger got worse after surgery because he was not able to provide for his family. (*Id.*) On examination, Plaintiff was cooperative, alert, and oriented times four, with organized thought processes, restricted affect, intact memory, normal attention, and fair insight, judgment, and impulse control. (*Id.* at 588-89.) The APN started Buspirone for anxiety and increased Citalopram for depression/anxiety. (*Id.* at 589.)

On February 8, 2017, a lumbar spine MRI showed no significant interval changes when compared to June 2016 MRI, including bilateral L3-L4 laminectomies and right L4-L5 laminectomy with enhancing post-surgical granulation tissue. (*Id.* at 1294.) Possible small nonenhancing loci of extruded disc material within a focus of granulation tissue contacting the right L5 nerve root was noted as potentially causing symptoms of L5 radiculopathy on the right. (*Id.*)

On February 21, 2017, Patty Rowley, M.D., another SAMC, examined the medical record and completed a physical RFC. (*Id.* at 94-107.) She identified multiple severe medically determinable physical impairments, including spine disorders, dysfunction of major joints, obesity, DDD (disorders of back-discogenic and degenerative), osteoarthrosis and allied disorders, and spinal cord disorders. (*Id.* at 99.) Dr. Rowley opined that Plaintiff had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 2 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; push and pull unlimited weight (other than shown for lift and carry); climb ramps or stairs occasionally, but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, knee, crouch, or crawl, with no manipulative, visual, communicative, or environmental limitations. (*Id.* at 102-03.) Based on his physical RFC, Plaintiff had the maximum sustained work capability for sedentary work. (*Id.* at 106.) Dr. Rowley found that

Plaintiff's alleged symptoms were "mostly but not completely" consistent with the medical evidence of record. (*Id.* at 101.)

On February 22, 2017, State Agency Psychological Consultant (SAPC), Sallie Boulos-Sophy, Ph.D., completed a Psychiatric Review Technique (PRT) for Plaintiff. (*Id.* at 99-100.) She noted that psychiatric review was not developed at initial disability determination, but found that Plaintiff had medically determinable medical impairments, including severe depressive, bipolar, and related disorders, as well as non-severe anxiety and obsessive–compulsive disorders. (*Id.* at 99.) Dr. Boulos-Sophy opined that Plaintiff had moderate difficulties in understanding, remembering, or applying information; mild difficulties in interacting with others; moderate difficulties in concentrating, persisting, or maintaining pace; and moderate difficulties in adapting or managing onself. (*Id.*) She also opined that Plaintiff's statements regarding impairment-related functional limitations and restrictions could not "reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record." (*Id.* at 100.)

Dr. Boulos-Sophy also completed a mental RFC assessment for Plaintiff. (*Id.* at 103-04.) She opined that he was moderately limited in the ability to understand and remember detailed instructions. (*Id.* at 104.) He had sustained concentration and persistence limitations and was moderately limited in the ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*) Plaintiff had adaption limitations and was moderately limited in the ability to respond appropriately to changes

in the work setting and to set realistic goals or make plans independently of others. (*Id.* at 105.)  Dr. Boulos-Sophy concluded that Plaintiff had the mental RFC to understand and carry out detailed but not complex instructions and work duties, sustain a typical workday, and maintain effective relationships and behavior required in competitive employment arenas. (*Id.*)

On May 9, 2017, Plaintiff returned to Parkland for a laminectomy at L3-4, L4-5, and L5-S1. (*Id.* at 1251-60)  After surgery, he was assessed with lumbar stenosis with radiculopathy and was able to meet his acute care physical therapy goals. (*Id.* at 1259-60.) When he was discharged on May 14, 2017, he denied having headaches. (*Id.* at 1260.)

On June 22, 2017, Plaintiff returned to Parkland for a post-surgery follow-up. (*Id.* at 1347-49.)  He reported some anterior thigh pain, and that he never had a "pain free" interval since surgery, but he did have "good days and bad days." (*Id.* at 1347.)  He did not have any headaches, but his pain had slightly worsened since he stopped taking Gabapentin. (*Id.*)  He also continued to have some pain in the right lower extremity. (*Id.*) Physical examination showed full 5/5 motor strength, sensation intact to light touch in all distributions, normal plantigrade gait, negative Hoffman, and downgoing Babinski. (*Id.* at 1348.)

A lumbar spine MRI dated August 29, 2017, showed interval postoperative changes consistent a with history of L3-L5 revision decompressive laminectomies, and nonspecific focal T2 hyperintense subcentimeter fluid collection at L4-5 level. (*Id.* at 1299.)  There was also multilevel degenerative changes of the lumbar spine, including residual/recurrent disc herniations at L3-4 and L4-5, with disc material narrowing the right lateral recess and displacing the descending nerve roots at L4-5 on the right. (*Id.*)

On October 20, 2017, Plaintiff returned to Metrocare for a routine visit. (*Id.* at 1276.)  The

examining APN noted that Plaintiff had a current GAF of 50, and that he was previously diagnosed with major depression disorder (recurrent episode, severe), unspecified anxiety disorder, and migraines (unspecified, not intractable, without status migrainosus). (*Id.*)  Plaintiff reported fairly managed depression and anxiety with medication and that he was coping fairly well with depression on his current regimen. (*Id.*)  He denied anhedonia, avolition, labile mood, delusion, auditory verbal hallucinations, and suicidal/homicidal ideation.  (*Id.*)  On examination, he was adequately groomed and had cooperative behavior, normal psychomotor appearance, logical thought content, and organized thought process, with fair judgment, insight, and impulse control. (*Id.* at 1278-79.)  He was alert and oriented on all four spheres, with euthymic mood and mood congruent affect. (*Id.* at 1279-80.)  The APN assessed fairly managed depression and anxiety with current regimen and continued Citalopram for depression/anxiety and vistaril for anxiety/insomnia. (*Id.* at 1280-81.)

On November 15, 2017, Plaintiff returned to Dr. Bayles with continued low back symptoms. (*Id.* at 1283-85.)  He reported constant low back and right hip pain that would vary with activities, but was never gone completely. (*Id.* at 1283.)  He also had constant right leg pain and occasional left leg pain, with numbness and pins and needles feelings along the leg, more right than left, as well as restricted lumbar range of motion with pain. (*Id.*)  On examination, Plaintiff ambulated without assistance, but he had a slow concentrated gait and was unable to perform full squat due to pain. (*Id.* at 1284.)  Lumbar range of motion was restricted, patellar reflexes were diminished on both sides, and the Achilles reflex was absent on the right. (*Id.*)  Patrick's FABER test was positive on the right with back and hip pain, and Ely's heel to buttocks test and hip hyperextension test were both negative bilaterally.  (*Id.*)  Dr. Bayles assessed post laminectomy syndrome with residual right radiculitis. (*Id.*)  He opined that Plaintiff could perform "sedentary light duty type of work" and was

able to lift up to 10 pounds frequently for no more than two hours a day, but never bend, kneel, squat, stoop, pull, push, twist or crawl. (*Id.* at 1285.) He needed to avoid climbing ladders and driving or operating heavy equipment, and be limited to standing/walking and sitting for no more than two hours a day, with the ability to take needed stretch breaks. (*Id.*)

On November 30, 2017, Plaintiff presented to Parkland with continued pain and radicular symptoms to the right lower extremity. (*Id.* at 1361-62.) He reported that the pain had been the same before surgery and was upset that he continued to have symptoms after two surgeries. (*Id.*) His inability to work due to pain caused him great distress. (*Id.* at 1362.) Physical examination showed 5/5 bilateral upper extremity strength, 5/5 left and 4+/5 right lower extremity strength, and decreased sensation throughout right lower extremity. (*Id.* at 1362.) An X-ray showed laminectomy with defects involving the lower lumbar spine and multilevel degenerative disc disease. (*Id.*)

On January 11, 2018, Ikechukwu Ofomata, M.D., a psychiatrist at Metrocare, completed a "Medical Assessment Of Ability To Do Work-Related Activities (Mental)" for Plaintiff. (*Id.* at 1367-69.)  He assessed Plaintiff with major depressive disorder, recurrent episode, severe and unspecified anxiety disorder, and opined that he had a "substantial loss of ability" to carry out detailed but uninvolved instructions; maintain regular attendance and be punctual within customary tolerances; maintain concentration and maintain attention/stay on task for two hours; perform at a consistent pace without an unreasonable number and length of breaks; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers; behave in an emotionally stable manner; respond appropriately to changes in a routine work setting; cope with normal work stresses; and finish a normal work week without interruption from psychologically based symptoms. (*Id.* at 1367-68.)  Dr. Ofomata indicated that the severity of his condition was

13

evidenced by crying spells, anhedonia, appetite and sleep disturbance, low energy, chronic disturbance of mood, difficulty thinking and confusion, and chronic depression. (*Id.* at 1368.) He explained that given Plaintiff's residual disease process, any symptom improvements in the clinical notes did not conflict with the assessed limitations because even a minimal increase in mental demands or change in environment would likely cause him to decompensate. (*Id.* at 1369.) He anticipated that Plaintiff's condition and treatment would cause him to be absent from work more than four days per month, and that his mental disorders were likely to exacerbate the degree of disability he experienced from his physical impairments. (*Id.*)

On January 10, 2018, Plaintiff presented to Erwin Cruz, M.D., for a neuro-electrodiagnostic consultation. (*Id.* at 1364-65.) He reported longstanding severe low back pain that radiated into the back of his hip and into his thigh and leg. (*Id.* at 1364.) On examination, Dr. Cruz noted obvious sciatic behavior with sitting intolerance and a loss of lumbar lordosis. (*Id.*) There was diffuse, marked tenderness on palpation in the lumbosacral spinous processes associated with increased tone of paravertebral muscles, as well as 4/5 weakness in the right foot dorsiflexors and invertors. (*Id.*) Dr. Cruz conducted a bilateral lower extremity EMG and NCV study and noted electrodiagnostic abnormalities consistent with an active and chronic radiculopathy at right L4-L5, as well as affected L4 and L5 innervated myotomes. (*Id.* at 1365.) He assessed lumbar intervertebral disc nuclear herniations at L3-L4 and L4-L5, with secondary nerve root compression, stenosis, and secondary radiculopathy. (*Id.*) He opined that Plaintiff had "failed back syndrome" and was "totally disabled" given the significant problems in his lumbar spine. (*Id.*) He determined that Plaintiff's physical limitations would prevent him from doing any kind of physical work, including desk work as it required prolonged sitting, and that he would "not be able to hold a job at this point." (*Id.*)

14

On January 13, 2018, Dr. Bayles provided a medical source statement for Plaintiff. (*Id.* at 1370-71.) He opined that Plaintiff continued with symptomatic low back pain and radicular complaints with positive radicular findings, but that he was capable of performing sedentary level work and possibly light work level. (*Id.* at 1371.) He experienced flare-ups of his symptoms that would require him to miss work more than four days per month because he would be nearly completely bed-bound due to pain and restricted range of motion. (*Id.*) When working, Plaintiff could only work at a very slow pace due to difficulty in ambulation, and he would have difficulty performing a full workday, as he could only work between one and two hours before needing a rest break. (*Id.*) Dr. Bayles also opined that Plaintiff would likely arrive late or leave early at least four times per month due to his back and leg pain. (*Id.* at 1370.)

## C.    **Hearing**

On January 24, 2018, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 39-84.) Plaintiff was represented by an attorney. (*Id.* at 41.)

### 1.    **Plaintiff's Testimony**

Plaintiff testified that he was 36 years old and had three teenage children. (*Id.* at 53.) He dropped out of school in the tenth grade because his girlfriend was pregnant and he needed to work. (*Id.* at 54.) He never got a GED or driver's license and relied on others for transportation. (*Id.*) At the time of his injury, he had been working for Aerotek for less than a year. (*Id.*) He previously worked at another company as an inventory supervisor, quality control inspector, and order puller. (*Id.* at 55-56.) Immediately after his injury, he received medications and started physical therapy, and he began receiving injections a few months later. (*Id.* at 56.) He returned to work two to three days after his injury and attempted to do light duty work. (*Id.* at 56-57.) After his first surgery, his

doctor restricted him to no more than a half day of work, and to lifting no more than 10 pounds and sitting and standing for no more than two hours each, with no bending, squatting, kneeling, climbing ladders, or operating heavy machinery. (*Id.* at 57-58.) He was unable to return to his current job because there was no light duty work available, and he did not attempt to find work elsewhere. (*Id.* at 59.) He had surgery in May 2014, and because it failed to relieve his symptoms, he had a second surgery in May 2017. (*Id.* at 58.) He had back pain down his right leg, as well as numbness and sensitivity throughout his right leg and toes that felt like pins and needles. (*Id.* at 59-60.) He attended physical therapy after both surgeries, but his symptoms would get worse as time progressed. (*Id.* at 61-62.) His last back MRI was in December 2017, and other than a lamina tear, there were no major differences between it and the MRI performed before his second surgery. (*Id.* at 63.)

Plaintiff also had stomach issues, and he would have migraine headaches lasting two days twice a month, which he treated with Tylenol. (*Id.* at 67.) He was recently diagnosed with diabetes and was dieting and taking new medications. (*Id.* at 68-69.) He had depression, which started after his first surgery, and he stopped sleeping and had feelings of worthlessness because he was unable to provide for his family. (*Id.* at 70.) He was prescribed medication for depression, but did not remember the name or where he got it from. (*Id.* at 71.) When having a bad day, he was unable to help his children with their homework and wanted to be left alone. (*Id.* at 72-73.) On an average day, he would see his kids off to school and would lay down or recline about eight hours a day. (*Id.* at 73-74.) Other than feeding his kids and washing dishes, he was unable to do any chores around the house. (*Id.* at 74.) He did not have any hobbies and stopped going to church two years ago. (*Id.* at 75.) He cried two to three times a week and was unable to sleep through the night because of pain. (*Id.*) He did not go out with friends, but they sometimes visited him at home. (*Id.* at 76.) He

experienced flare-ups of extreme pain lasting up to five days, and would need his wife to help him get up, go to the bathroom, and shower. (*Id.* at 77-78.) His medications made him drowsy and would upset his stomach. (*Id.* at 78.)

    **2.**    **VE's Testimony**

The VE testified that Plaintiff had previous work experience as a quality control inspector, which was light work with a SVP of 6; an inventory supervisor or inventory manager, which was light work with a SVP of 6; and an order puller, which was medium work with a SVP of 2. (*Id.* at 79.) A hypothetical person with the same age, education, and work experience history as Plaintiff would not be capable of performing his past work with the following limitations: lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for two hours in an eight-hour workday, with no assistive device required for standing or walking; sit for six hours in an eight-hour workday, with the option to change position (e.g., stand up and stretch) at the workstation for two minutes every thirty minutes; climb ramps and stairs occasionally, but never climb ladders, ropes, or scaffolds; stoop, kneel, or balance occasionally, but never crouch or crawl; understand, remember, and carry out detailed but not complex instructions to work, with no limitations on social interactions; and never drive or work near hazards, including open flames and moving machinery parts. (*Id.* at 80.) There was other available work that the hypothetical person could perform, including addresser (sedentary and SVP-2) with 17,250 jobs nationally; document preparer (sedentary and SVP-2) with 35,670 jobs nationally; and production worker–final assembler (sedentary and SVP-2) with 117,500 jobs nationally. (*Id.* at 81.) The tolerance for absenteeism was one to two absences per month, and was the same for coming late or leaving early; the tolerance for being off task outside of typical breaks was 10 percent of the time. (*Id.* at 82-83.) If the same

17

hypothetical person was limited to standing two hours, walking two hours, and sitting two hours in an eight-hour day, he would not be able to maintain and sustain any job in the national economy. (*Id.* at 82.) The inability to maintain concentration for two hours would preclude competitive work. (*Id.*) The VE's testimony did not conflict with the Dictionary of Occupational Titles, except that her testimony on stretch breaks, off task time, and absences was based on her experience. (*Id.* at 83.)

**D.    ALJ's Findings**

The ALJ issued a decision denying benefits on September 5, 2018. (*Id.* at 16-31.) At step one, she found that Plaintiff had engaged in substantial gainful activity since his onset date of September 16, 2013, in the months between September and December 2013. (*Id.* at 18.) At step two, the ALJ found that he had the following severe impairments: back disorder, obesity, and depression disorder. (*Id.* at 19.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.*)

Next, the ALJ determined that Plaintiff had the following RFC: lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for two hours in an eight-hour workday, with no assistive device required for standing or walking; sit for six hours in an eight-hour workday, with the option to change position (e.g., stand up and stretch) at the workstation for two minutes every thirty minutes; climb ramps and stairs occasionally, but never climb ladders, ropes, or scaffolds; stoop, kneel, or balance occasionally, but never crouch or crawl; understand, remember, and carry out detailed but not complex instructions to work, with no limitations on social interactions; and never drive or work near hazards, including open flames and moving machinery parts. (*Id.* at 21-22.) At step four, the ALJ determined that Plaintiff was unable to perform his past

work as quality control inspector, inventory manager, or order puller. (*Id.* at 29.)  At step five, the ALJ found that although Plaintiff was not capable of performing past relevant work, considering his age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that he could perform. (*Id.* at 30.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from September 16, 2013, the alleged onset date, through the date of the ALJ's decision. (*Id.* at 31.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the

determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents four issues for review:

1.     The ALJ erred in rejecting the opinions of claimant's treating physicians and in failing to acknowledge all restrictions imposed by the treating physicians.

2.     The ALJ erred in failing to list all severe impairments.

3.     The ALJ erred in citing to non-existent records and to records that appear to be unrelated to the evidence cited.

4.     The ALJ erred in not admitting Exhibit 42F into the record.

(doc. 12 at 1-2.)

## A.     **Severe Impairment**[4]

Plaintiff argues that the ALJ erred in failing to include his anxiety disorder and migraines as severe impairments. (doc. 12 at 9.)

---

[4]This issue is addressed before Plaintiff's second issue because it involves an earlier stage of the disability determination process.

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii), (c).  To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010).  Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  The Fifth Circuit has held that a literal application of this regulation would be inconsistent with the Social Security Act because the regulation includes fewer conditions than indicated by the statute. *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985).  Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id.* at 1101.  In other words, "the claimant [need only] make a *de minimis* showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n.5 (5th Cir. 1992) (citation omitted).  When determining whether a claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient severity. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523).  The claimant has the burden to establish that her impairments are severe. *See Bowen v. Yukert*, 482 U.S. 137, 146 n.5 (1987).

### 1.    *Anxiety Disorder*

Plaintiff points to the medical records from Metrocare, including a medical source statement from Dr. Ofomata, as evidence of his anxiety disorder. (doc. 12 at 9.)  They show that he reported

depressive and anxiety symptoms, including anxiety attacks and excessive worry, and that he was receiving treatment at Metrocare for unspecified anxiety disorder. (doc. 8-1 at 587-89)  At a later appointment, he reported that his depression and anxiety were fairly managed with medications, that he was coping fairly well on his current regimen, and that he did not want to change it. (*Id.* at 1276.) It also noted that he was diagnosed with unspecified anxiety disorder and had a GAF score of 50. (*Id.*)  A January 2018 mental limitations form completed by Dr. Ofomata listed unspecified anxiety disorder as an additional impairment, but it did not indicate how his anxiety disorder specifically affected his ability to work or the limitations identified. (*See id.* at 1367-69.)

In her decision, the ALJ noted that there was some evidence of mental impairments in the record, but Plaintiff's "longitudinal record [did] not evidence a long history of treatment for said mental impairments, nor [did it] evidence a consistent history of [his] mental impairments resulting in debilitating mental-impairment-related symptomology." (*Id.* at 24.)  Consistent with this observation, she found that Metrocare's medical records showed "unremarkable" mental status examinations, with Plaintiff noted as being oriented to person, place, time, and situation, and having an intact memory, organized thought content, normal attention, fair insight, judgment, and impulse control, and a euthymic mood. (*Id.* at 25.)

Plaintiff has not shown that his anxiety disorder was a medical impairment severe enough to be expected to interfere with his ability to work. *See Anthony*, 954 F.2d at 294 n.5.  As discussed, his medical records showed that he only occasionally displayed symptoms of anxiety, and that his medications fairly managed his symptoms.  Substantial medical evidence supports the ALJ's findings that Plaintiff's anxiety disorder did not interfere with his ability to perform work-related activities.  *See Hammond v. Barnhart*, 124 F. App'x 847, 853 (5th Cir. 2005) (holding that, even

though there was "some evidence that point[ed] to a conclusion that differ[ed] from that adopted by

the ALJ," there was no error because there was "far more than a scintilla of evidence in the record

that could justify [the] finding that [the plaintiff's] impairments were not severe disabilities"); *see*

*also McDaniel v. Colvin*, No. 4:13-CV-989-O, 2015 WL 1169919 at *5 (N.D. Tex. Mar. 13, 2015)

(finding that the ALJ did not err in finding impairments to be non-severe because the ALJ

considered the relevant evidence in his decision and the plaintiff did not point to evidence showing

"any work-related limitations beyond those already found by the ALJ").  Accordingly, the ALJ did

not err.

### 2.   *Migraines*

As evidence of his migraines, Plaintiff points to a treatment note by a Metrocare APN that

listed "migraine, unspecified, not intractable, without status migrainosus" as one of his previously

diagnosed impairments.  (doc. 8-1 at 1276.) Other than this notation, however, there was no mention

of headaches or migraines in the treatment notes. (*See id.* at 1276-82.)  While the medical records

show that Plaintiff complained of headaches after spinal surgery and was prescribed medication for

migraines, there was no other mention in the record of continued treatment for migraines, or their

effect on him and his ability to work. *See Lopez v. Astrue*, 854 F. Supp. 2d 415, 426 (N.D. Tex.

2012) (finding no error in ALJ's failure to consider plaintiff's bilateral inguinal hernias as

impairments because there was no mention in record of treatment received by plaintiff for the

hernias or their effect on plaintiff, and because no physician imposed any limitation or restriction

on plaintiff as a result of the hernias).

Plaintiff has not shown that his migraines was a medical impairment severe enough to

interfere with his ability to do work. *See Anthony*, 954 F.2d at 294 n.5.  The medical evidence

instead shows substantial evidence to support the ALJ's finding that his migraines was not a medically determinable impairment that would interfere with his ability to perform work-related activities. *See Andrews v. Astrue*, 917 F. Supp. 2d 624, 639 (N.D. Tex. 2013) (finding no error when the ALJ determined an impairment to be non-severe, even though the SAMC found moderate limitations due to the impairment, because there was a lack of examining medical evidence showing any effect on the plaintiff's ability to work); *see also McDaniel*, 2015 WL 1169919, at *5. Accordingly, the ALJ did not err.

Because Plaintiff failed to meet his burden to show that his anxiety disorder and migraines were severe impairments, remand is not required on the second issue. Moreover, even if the ALJ erred in failing to find that his anxiety disorder and migraines were severe impairments, she proceeded beyond step two. (*See* doc. 8-1 at 21-31.) The Fifth Circuit has stated that a failure to make a severity finding at step two is not reversible error when an ALJ continues with the sequential evaluation process. *Herrera*, 406 F. App'x at 903 (citing *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987)) (noting the ALJ's failure to make a severity finding at step two was not a basis for remand where the ALJ proceeded to later steps of the analysis); *Mays v. Bowen*, 837 F.2d 1362, 1365 (5th Cir. 1988) (per curiam) ("[I]f the ALJ proceeds past the impairment step in the sequential evaluation process the court must infer that a severe impairment was found."). Accordingly, even if the ALJ erred in failing to consider whether Plaintiff's anxiety disorder and migraines were severe impairments, the error was harmless because she proceeded beyond step two. *See Norris v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL 1078524, at *13 (N.D. Tex. Mar. 22, 2017) (finding that even if the ALJ erred in failing to explain why he found only certain impairments to be severe, the error was harmless where he proceeded with the sequential evaluation process).

B.    <u>**Treating Source Opinion**</u>

Plaintiff argues that the ALJ erred in rejecting the opinions of his treating physicians and in failing to acknowledge their imposed restrictions. (doc. 12 at 6.)

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* They may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence[.]" *See Johnson*, 864 F.2d at 343 (citations omitted).

Although every medical opinion is evaluated regardless of its source, the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2).[5] A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had

---

[5]On January 18, 2017, the Administration updated the rules on the evaluation of medical evidence. *See* 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Because Plaintiff filed her application before the effective date, the pre-2017 regulations apply.

an ongoing treatment relationship with the claimant. *Id.* at § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* at § 404.1527(c)(2).  If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  *See id.* at § 404.1527(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected.  *Id.*  Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical

bases for a contrary opinion." *Id.* at 458. Additionally, "where the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

### 1.    *Dr. Cruz*

Plaintiff contends that the ALJ erred by according insufficient weight to Dr. Cruz's medical opinion as his treating physician. (doc. 12 at 6.)

Dr. Cruz examined Plaintiff once in January 2018 for an EMG/NCV study. (doc. 8-1 at 1364-65.) He found that the EMG/NCV indicated right L4 and L5 radiculopathy, and that Plaintiff had significant spinal problems in his lumbar spine. (*Id.* at 1365.) He opined that Plaintiff was "totally disabled," and that he might require lumbar spine fusion based on his lumbar spine MRI. (*Id.*) Dr. Cruz concluded that Plaintiff had physical limitations that would "prevent him from doing any kind of physical work and even desk work which requires prolonged sitting," and he would "not be able to hold a job at this point." (*Id.*)

The ALJ ultimately assigned "little weight" to Dr. Cruz's opinion, finding the majority of his opinion conclusory and involving the determination of disability, "an opinion reserved to the Commissioner." (*Id.* at 26.) She pointed out that Dr. Cruz's opinion that Plaintiff's physical limitations prevented him from work that required prolonged sitting was vague and did not "detail function-by-function what the claimant could do." (*Id.*) The ALJ also found the "assertion that the claimant's physical limitations would prevent him from doing any work, [was] inconsistent with other physical examinations of the claimant, performed around the same time as Dr. Cruz's examinations." (*Id.*) She noted that while these examinations indicated some decreased range of

28

motion in the lumbar spine and some decreased sensation in the lower extremities, they "did not indicate the type of physical limitations that would prevent one from doing any work." (*Id.*)

Plaintiff has not shown that Dr. Cruz is a treating source. Other than the EMG/NCV study administered on January 10, 2018, Dr. Cruz does not appear in any of the other evidence of record and therefore does not appear to qualify as a treating physician. (doc. 8-1 at 1364-65); *see* 20 C.F.R. § 404.1502 (explaining that a treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant); *see also Hernandez v. Heckler*, 704 F.2d 857, 860-61 (5th Cir. 1983) (affirming finding that a doctor who saw claimant twice in a 17 months was not a treating physician); *Payne v. Colvin*, No. 3:15-CV-2557-BH, 2016 WL 5661647, at *11-12 (N.D. Tex. Sept. 28, 2016) (finding that an ALJ did not err in failing to find that a doctor was a treating physician where the doctor only met with the plaintiff once). The ALJ did not err by failing to find that Dr. Cruz was a treating physician whose opinion deserved controlling weight under 20 C.F.R. § 404.1527(c) because there is no record evidence that he actually was Plaintiff's treating physician. *See Rodriguez v. Shalala*, 35 F.3d 560, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir.1990)) ("[W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly."); *see also Robinson v. Astrue*, 271 F. App'x 394, 396 (5th Cir. 2008) ("Wong performed a one-time consultative examination of Robinson and therefore is not due special deference as a treating physician.").

Even if Dr. Cruz was a treating physician, the ALJ properly discounted his statement that

Plaintiff was disabled and unable to work due to his lumbar spine. (*See* doc. 8-1 at 25-26.)  A treating physician's opinions regarding a plaintiff's disability are not medical opinions and are not entitled to any special significance because the issue of disability is a legal conclusion reserved to the Commissioner. 20 C.F.R. § 404.1527(d); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003). Because physicians generally define "disability" in a manner distinct from the Social Security Act, an ALJ can properly reject any conclusion of disability as determinative on the ultimate issue. *See Tamez v. Sullivan*, 888 F.2d 334, 336, n.1 (5th Cir. 1989) (doctor's note that claimant was "disabled" did not mean that the claimant was disabled for purposes of the Social Security Act).  Further, the ALJ specifically noted the inconsistency between Dr. Cruz's restrictive physical limitations and Plaintiff's physical examinations showing no indication of physical limitations that would prevent him from doing any work. (*See* doc. 8-1 at 26.)  As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available, and the record as a whole. *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (citing *Newton*, 209 F.3d at 458).  Substantial evidence properly supports the ALJ's appropriate evaluation of Dr. Cruz's medical opinion.  Accordingly, a reviewing court must defer to the ALJ's decisions. *See Leggett*, 67 F.3d at 564. Remand is not warranted on this issue.

### 2.    *Dr. Bayles*

Plaintiff contends that the ALJ erred because she failed to properly evaluate Dr. Bayles's medical opinions. (doc. 12 at 6-7.)

Between September 2013 and March 2016, Dr. Bayles visited with Plaintiff numerous times for lumbar spine treatment, and completed work status reports regarding his ability to return to his current job duties. (*See* doc. 8-1 at 370-450.)  Dr. Bayles's treatment notes indicated that Plaintiff

had symptomatic low back pain and right leg and hip pain; tenderness and diminished range of motion of the lumbar spine; and numbness, weakness, and decreased sensation of the right lower extremity, including positive SLR testing and FABER Patrick's testing on the right. (*Id.*) Dr. Bayles's work status reports generally concluded that Plaintiff's lumbar spine injury prevented him from fully performing his current job duties and that he could only return to work with certain posture, motion, and lift/carry restrictions, including lift/carry no more than ten pounds for two hours a day; stand, walk, and/or sit for two hours a day; and never kneel/squat, bend/stoop, push/pull, twist, or climb stairs and ladders. (*Id.* at 375, 378, 381, 387, 399, 403, 406, 409, 412, 413, 416, 417, 430, 435, 438, 441, 450.) He opined that these limitations became permanent in the work status report dated January 20, 2016. (*Id.* at 441.)

On November 15, 2017, Dr. Bayles completed a medical source statement, opining that Plaintiff was capable of doing light duty type work with the following restrictions: lift up to 10 pounds frequently for no more than two hours per day; stand/walk and sit for no more than two hours a day with the ability to take stretch breaks as needed; and never bend, kneel, squat, stoop, pull, push, twist, crawl, climb ladders, drive, or operate heavy equipment. (*Id.* at 1284-85.) Dr. Bayles provided another medical source statement dated January 13, 2018, and opined that Plaintiff was capable of performing sedentary level work and possibly light work level, but that his back and leg pain would cause him to be absent from work more than four days per month and to arrive late or leave early at least four times per month. (*Id.* at 1370-71.) He also opined that Plaintiff could only work at a very slow pace due to difficulty in ambulation and that he could work a maximum of one to two hours at a time before needing a rest break. (*Id.*)

The ALJ expressly considered Dr. Bayles's treatment notes, work status reports, and medical

31

source statements, but ultimately gave little weight to his opinions. (*Id.* at 27-28.)  The ALJ first

noted that Dr. Bayles's opinions contained within the work status reports did not opine on "what the

claimant could do despite his medically determinable impairments and resulting limitations," but

on "whether the claimant could return to performing the job duties he had at Aerotek . . . with no

restrictions or with certain restrictions." (*Id.* at 27.)  Second, the ALJ noted that in the November

2017 and January 2018 medical source statements, Dr. Bayles "did not specify the time-period

covered by his respective opinions [or] indicate what files he reviewed when authoring the January

2018 opinion." (*Id.* at 28.)  Lastly, the ALJ pointed out that in the work status reports, the amount

of weight Plaintiff could lift for two hours ranged between five and twenty pounds, but Dr. Bayles

never explained why Plaintiff "could lift no more than five pounds one day but a month later [he]

could lift twenty pounds." (*Id.*)

Although the ALJ did not make a specific finding as to each of the factors in 20 C.F.R. §

404.1527(c)(1), she specifically stated that she considered opinion evidence in accordance with the

requirements of 20 C.F.R. § 404.1527. (*See id.* at 22.)  Her decision reflects consideration of the

factors: she found that Dr. Bayles had met with Plaintiff over twenty-five times between September

2013 and March 2016, that the medical evidence in the record did not support debilitating

limitations, that the time period was not identified in his recent opinions, and that there were

unexplained fluctuations in the limitation levels of certain restrictions. (*Id.* at 23, 28-29.) The

regulations require only that the Commissioner "apply the factors and articulate good cause for the

weight assigned to the treating source opinion." *See* 20 C.F.R. § 404.1527(c)(2); *Brewer v. Colvin*,

No. 3:11-CV-3188-N, 2013 WL 1949842, at *6 (N.D. Tex. Apr. 9, 2013), *adopted by* 2013 WL

1949858 (N.D. Tex. May 13, 2013); *Johnson v. Astrue*, No. 3:08-CV-1488-BD, 2010 WL 26469,

at *4 (N.D. Tex. Jan. 4, 2010). "The ALJ need not recite each factor as a litany in every case." *Brewer*, 2013 WL 1949842, at *6 (citing *Johnson*, 2010 WL 26469, at *4).

Moreover, the ALJ also considered the purpose of the work status reports, and found Dr. Bayles's opinions were based on different considerations and standards than those utilized by the Social Security Administration in the disability determination process. (*Id.* at 27.)  "[T]he determinations of other agencies, while persuasive, do not bind the Social Security Administration." *Loza*, 219 F.3d at 393 (citing 20 C.F.R. § 404.1504).  As the fact-finder, the ALJ had the sole responsibility for deciding whether Dr. Bayles's opinions, including those contained in the work status reports, were supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) (per curiam); *see also Johnson v. Sullivan*, 894 F.2d 683, 686 (5th Cir. 1990) ("To the extent he was so required, we find the Secretary properly considered the state workmen's compensation settlement in deciding that Johnson was not disabled."); *Carter v. Astrue*, No. CIV. H-08-2844, 2009 WL 2901556, at *12 (S.D. Tex. Sept. 1, 2009) (finding no error in the ALJ's reason to decline following an opinion because the physician's "examination was solely for the purpose of determining whether there was a compensable impairment under the workers' compensation laws"); *Wesley v. Astrue*, No. 3:11-CV-741-BH, 2012 WL 4473089, at *13 (N.D. Tex. Sept. 28, 2012) ("Because the disability determination falls within the purview of the ALJ, he was not required to accept all of Dr. Rodriguez's conclusions or the Workers' Compensation report.").

The ALJ's reasons for assigning only limited weight to Dr. Bayles's opinions, combined with her review and analysis of the objective record, satisfy her duty under the regulations and constitute "good cause" for affording only limited weight to his opinions. *See Brewer*, 2013 WL 1949842, at *6 (finding the ALJ's explanation as to why he did not give controlling weight to a treating

physician's opinion constituted "good cause" even though he did not make a specific finding as to each of the factors set forth in 20 C.F.R. § 1527(c)(2)); *Johnson*, 2010 WL 26469, at *4 (same); *Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205, at *6 (N.D. Tex. Mar. 25, 2011) (same).  Remand is not warranted on this issue.

**3.    *Dr. Ofomata***

Plaintiff contends that the ALJ erred by failing to give controlling weight to Dr. Ofamata's medical opinions as his treating physician. (doc. 12 at 7-8.)

Dr. Ofomata provided a one-time functional disability assessment, opining that Plaintiff had an "extreme loss of ability" to carry out detailed but uninvolved instructions; maintain regular attendance and be punctual within customary tolerances; maintain concentration and maintain attention/stay on task for two hours; perform at a consistent pace without an unreasonable number and length of breaks; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers; behave in an emotionally stable manner; respond appropriately to changes in a routine work setting; cope with normal work stresses; and finish a normal work week without interruption from psychologically based symptoms. (doc. 8-1 at 1367-68.)  He concluded that Plaintiff's condition and treatment would cause him to be absent from work more than four days per month, and that his mental disorders were likely to exacerbate the degree of disability he experienced from his physical impairments. (*Id.*)

The ALJ ultimately assigned "little weight" to Dr. Ofomata's opinion, finding the "severity of the mental-impairment-related symptomology described by Dr. Ofomata" inconsistent with the objective medical evidence of record. (*Id.* at 27.)  She pointed out that his opinion did not reference

the records being considered, nor identify the dates it covered. (*Id.*)[6]

Plaintiff has not shown that Dr. Ofomata is a treating source. Although Dr. Ofomata is a psychiatrist at Metrocare, it is not clear if he actually examined Plaintiff in person when he completed the assessment of Plaintiff's functional limitations on January 11, 2018. (*See id.* at 1367-69.) Additionally, there are no medical documents in the administrative record indicating that Plaintiff ever met with Dr. Ofomata, or that he signed off on his records.[7] (*See id.* at 587-93, 1263-82); *see* 20 C.F.R. § 404.1502. The ALJ did not err by failing to find that Dr. Ofomata was a treating physician whose opinion deserved controlling weight under 20 C.F.R. § 404.1527(c) because there is no record evidence that he actually was Plaintiff's treating physician. *See Hernandez,* 704 F.2d at 860-61; *see also Robinson v. Astrue*, 271 F. App'x 394, 396 (5th Cir. 2008) ("Wong performed a one-time consultative examination of Robinson and therefore is not due special deference as a treating physician."). Further, she specifically noted the inconsistency between Dr. Ofomata's extreme "mental-impairment-related symptomology" and Plaintiff's longitudinal records. (*Id.* at 27.) As discussed, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available, and the record as a whole. *See Walker*, 158 F. App'x at 535. Substantial evidence properly supports the ALJ's appropriate evaluation of Dr.

---

[6]The ALJ attributed "good weight" to the SAPC's review of medical evidence and opinion that Plaintiff was capable of understanding and carrying out detailed but not complex instructions and work duties, sustaining a typical workday, and maintaining effective relationships and behavior required in competitive employment arenas, finding it "authored by someone with program knowledge and [ ] not inconsistent with [Plaintiff's] longitudinal record." (*Id.* at 25.)

[7]To the extent that Plaintiff is arguing that Metrocare itself should be considered a "treating physician" and given controlling weight, courts in this district have differentiated between the medical opinions of various doctors at Metrocare when considering the opinions of treating physicians. *See, e.g., Payne v. Colvin*, No. 3:14-CV-2557-BH, 2016 WL 5661647, at *12 (N.D. Tex. Sept. 28, 2016) (finding no error when the ALJ determined that a Metrocare supervising psychiatrist was not a treating source because it was "not clear if she actually examined the plaintiff in person because the 'service provider' listed by Metrocare Services was actually [a different individual]"); *Bookman v. Colvin*, 3:13-CV-4428-B, 2015 WL 614850, at *8 & n.3 (N.D. Tex. Feb. 12, 2015) (noting the inconsistency between the medical records of the treating physician at Metrocare and other Metrocare professionals).

Ofomata's medical opinion, and a reviewing court must defer to the ALJ's decisions. *See Leggett*, 67 F.3d at 564. Because the ALJ afforded the appropriate weight to the physicians' opinions, remand is not required on this issue.

## C.    <u>Citation Errors</u>

Plaintiff argues that the ALJ erred because her decision contained incorrect citations to the record and appeared to reference non-existent records. (doc. 12 at 9-10.)

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays*, 837 F.2d at 1364. "Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp.2d 823, 837 (N.D. Tex. 2008) (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

Here, Plaintiff contends that the ALJ's decision referenced exhibits and page numbers that he could not "readily associate with the materials used," and that he was prejudiced because he was unable to "properly review the ALJ's decision as a result of these improper citations." (doc. 12 at 9-10.) He points to three examples of improper record cites in the ALJ's decision,[8] but only one of those citations is actually incorrect.[9] (*Id.*) "Even if the ALJ improperly cited to the record in his

---

[8]In support of his claim of a continuing "pattern of incorrect citations," Plaintiff first points to the ALJ's discussion of a May 2016 examination that cited "Exhibit 37F, pp. 42-43," but claims that the citation was "actually to an emergency room visit." (doc. 12 at 9-10.) Because there was an examination during this ER visit, and the findings in that record are consistent with the ALJ's discussion of that examination, Plaintiff fails to show error. (*Compare* doc. 8-1 at 24 *with id.* at 1331.) He next references the decision's citation to "Exhibit 34F, pp. 34-47," but fails to argue how or why this citation is incorrect. (*See* docs. 12 at 10; 8-1 at 24, 1245-47.)

[9]It is clear that the ALJ incorrectly cited "Ex. 3F, pp. 24-26," when discussing a November 2016 examination because those page numbers do not exist in that exhibit. (*See* doc. 8-1 at 24, 451-61.)

report, this does not constitute a basis for remand unless the improprieties would cast into doubt the existence of substantial evidence to support the ALJ[']s decision." *Fuller v. Comm'r of Soc. Sec. Admin.*, No. 4:14CV663, 2016 WL 1103946, at *1 (E.D. Tex. Mar. 22, 2016) (citing *Morris*, 864 F.2d at 335). With the exception of one incorrect citation of the record, the ALJ properly cited evidence throughout her decision and substantial evidence supported her disability determination. *See Morris*, 864 F.2d at 335; *Fuller*, 2016 WL 1103946, at *1 ("Here, there is substantial evidence in the record to support the ALJ's findings, and any error due to a missing page number or other citation error is harmless."). Further, Plaintiff's suggestion that this "improper citation" made it impossible to review the ALJ's decision lacks merit, as the misidentified medical record would have been located after a cursory review of the record.[10] *See Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999) ("[T]he ALJ's reference to an 'Ex. B at 5,' which is not in the record, is nothing more than a typographical error" as the ALJ's "reference recites the medical findings in [the correct] Exhibit B–5."); *see also Poteet v. Berryhill*, No. 4:16-CV-161-A, 2017 WL 2303520, at *1 n.3 (N.D. Tex. May 25, 2017) ("That the opinion of the ALJ contained typographical errors and was not the most articulately written does not persuade the court that form should prevail over substance."). Accordingly, remand is not warranted on this issue.

## D.    <u>Rejected Evidence</u>

Plaintiff argues that the ALJ violated Social Security Ruling (SSR) 17-4p by refusing to admit into the record a medical record submitted after the hearing. (doc. 12 at 11.)

SSR 17-4p requires the ALJ to assist claimants in developing evidence and other information

---

[10]Even though the electronic filing of the administrative record consists of over 1300 pages, the exhibits are labeled, book-marked, and hyperlinked for easy review. (*See generally* doc. 8-1.) As noted by the Commissioner, although the ALJ's reference to Exhibit *3F* was typographical error, it is clear that the ALJ was actually referencing Exhibit *34F*. (*See* docs. 16 at 25; 1235-37.)

in disability and blindness claims.  *See* SSR 17-4p; Titles II & XVI: Responsibility for Developing

Written Evidence, 2017 WL 4736894 (S.S.A. Oct. 4, 2017).  It provides in relevant part:

> We will assist with developing the record and may request existing evidence directly
> from a medical source or entity that maintains the evidence if:
>
>> - [w]e were informed about the evidence (in the manner explained above) no
>> later than 5 business days before the date of the scheduled hearing; or
>>
>> - we were not informed about the evidence at least 5 business days before the
>> date of the scheduled hearing, but one of the circumstances listed in 20 CFR
>> 404.935(b) or 416.1535(b) applies.

*Id.* at *6.  The circumstances the ALJ considers when the claimant misses the deadline for

submitting written evidence include:

> (1) Our action misled you;
>
> (2) You had a physical, mental, educational, or linguistic limitation(s) that prevented
> you from informing us about or submitting the evidence earlier; or
>
> (3) Some other unusual, unexpected, or unavoidable circumstance beyond your
> control prevented you from informing us about or submitting the evidence earlier.
> Examples include, but are not limited to:
>
>> (i) You were seriously ill, and your illness prevented you from contacting us
>> in person, in writing, or through a friend, relative, or other person;
>>
>> (ii) There was a death or serious illness in your immediate family;
>>
>> (iii) Important records were destroyed or damaged by fire or other accidental
>> cause; or
>>
>> (iv) You actively and diligently sought evidence from a source and the
>> evidence was not received or was received less than 5 business days prior to
>> the hearing.

*See* 20 C.F.R. §§ 404.935(b), 416.1435(b).

Here, Plaintiff submitted Exhibit 42F, a three-page medical record from TBI dated January

9, 2015, to the ALJ a day before the administrative hearing. (*See* doc. 8-1 at 42.)  At the beginning

of the hearing, his attorney explained that the record had been submitted before, but it was being

resubmitted because a page did not scan properly. (*Id.*)  In her decision, the ALJ found that the

requirements of 20 C.F.R. § 404.935(b) were not satisfied and declined to admit Exhibit 42F. (*Id.*

at 16.)  Because Exhibit 42F was not submitted five business days before the hearing, it was

untimely. *See* SSR 17-4p; 20 C.F.R. § 404.935(a).  Further, Plaintiff has not alleged any of the

circumstances in 20 C.F.R. § 404.935(b) to excuse his untimeliness.  Because Plaintiff's submission

of Exhibit 42F was untimely, and because his circumstances did not meet any of the conditions in

20 C.F.R. § 404.935(b), the ALJ did not err in not admitting this exhibit. *See* SSR 17-4p; 20 C.F.R.

§ 404.935(b).

Plaintiff argues that the ALJ violated SSR 17-4p when she did not admit Exhibit 42F because

she "had effective notice of this source in that multiple other items had been submitted from the

same general source, that is Texas Back Institute." (doc. 12 at 11.)  A violation of a ruling may

"constitute error warranting reversal and remand when an aggrieved claimant shows prejudice

resulting from the violation." *Pearson v. Barnhart*, No. 1:04-CV-300, 2005 WL 1397049, at *4

(E.D. Tex. May 23, 2005) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)).  Remand for

failure to comply with a ruling is appropriate only when a complainant affirmatively demonstrates

ensuant prejudice. *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981) (per curiam).  To establish

prejudice, Plaintiff must show that the ALJ's rejection of the written evidence might have led to a

different decision of disability. *See Newton*, 209 F.3d at 458.

Even if the ALJ erred in not admitting Exhibit 42F, Plaintiff does not present any argument

for how he was prejudiced.  Further, a complete copy of the medical record found at Exhibit 42F is

already exhibited in the record. (*Compare* doc. 8-1 at 1372-74 *with id.* at 930-32.)  Because Plaintiff failed to demonstrate prejudice from the ALJ's purported failure to follow SSR 17-4p, remand on this issue is not warranted. *See Mays*, 837 F.2d at 1364.

## IV.  RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED**, on this 2nd day of October, 2020.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE